IN THE UNITED DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

CHRISTOPHER MILTON             :
2108 MATHERWAY STREET, APT. A  :   CIVIL ACTION NO.
ELKINS PARK, PA 19027          :
            PLAINTIFF,           :   JURY TRIAL DEMANDED
                     :
     v.                       :
                     :
HOMELAND INTELLIGENCE AND       :
PROTECTIVE SERVICES             :
325 CHESTNUT STREET             :
PHILADELPHIA, PA 19103          :
           DEFENDANT.             :

---

## COMPLAINT IN CIVIL ACTION

1. This matter is brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), the ADA, and the ADAA.  Jurisdiction is based on 28 U.S.C. S 1331 and 28 U.S.C. S 1343, and the aforementioned federal statutes.  The plaintiff also makes state law claims under the Pennsylvania Human Relations Act, and for common law state law claims.  Supplemental jurisdiction for those state law claims is invoked pursuant to 28 U.S.C. S 1367 (a) to hear and adjudicate state law claims.

PARTIES

PARTIES

2.   The plaintiff, Christopher Milton (the plaintiff) is a resident and citizen of the Commonwealth of Pennsylvania, who resides at the address indicated in the caption above.

3.   The defendant, Homeland Intelligence and Protective Services, LLC (the defendant) is a limited liability corporation which does business in the Commonwealth of Pennsylvania and has a business office that is indicated in the caption above – the defendant employees approximately a little over forty personnel in Philadelphia, including those who provide security/detective services at Thomas Jefferson University Hospital; the defendant's business is licensed by the Commonwealth of Pennsylvania as one that provides detective and investigative services, and is subject to the provisions of the Commonwealth of Pennsylvania Private Detectives Act of 1953, 22 Pa. C.S. S. 23.

ADMINISTRATIVE AGENCY REQUIREMENTS

4.   The plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission (EEOC) at Charge No. 530-2024-08956, for which he received a Right to Sue Letter dated October 24, 2024.

2

## FACTUAL ALLEGATIONS

5. The plaintiff is male.

6. The plaintiff became disabled and/or partially disabled while working for the defendant, after a workplace injury, when he injured his back walking upstairs; the defendant perceived the plaintiff to be disabled and treated him as if he was disabled, including that it eventually refused to allow him to work with or without an accommodation.

7. Despite his back injury, the plaintiff was able to perform the essential functions of his job, with or without accommodation.

8. At all times relevant, the plaintiff was well qualified to perform his duties as the "Operations Manager" for the defendant.

9. The plaintiff is a licensed detective in the Commonwealth of Pennsylvania (Pennsylvania or the Commonwealth), having obtained his license in 1993: he has enjoyed immense success in his profession, including as a detective and in the provision of security services, for which he has earned a great reputation in his profession.

10. The plaintiff has reputations for being competent, hardworking and ethical in his profession, throughout the Commonwealth, including with people

3

he has worked for and with people who have worked under his supervision.

11. The defendant's owner is Brandon Womack; the defendant's Vice President of Operations is Mr. Christopher Rodriguez.

12. Mr. Womack and the defendant hired the plaintiff as the defendant's Operations Manager on November 17, 2023 – the hire was based on the plaintiff's credentials, experience and great reputation; the plaintiff fell under the direct supervision of Mr. Womack and Mr. Rodriguez.

13. Upon his hire, the plaintiff's office was at 325 Chestnut Street in Philadelphia.

14. After his hire, the defendant instructed the plaintiff, that as the Operations Manager, that he had the right to fire and hire his subordinates, of which the plaintiff had over forty subordinates.

15. The subordinates were security officers, some of who were assigned as "leads", who were essentially allowed to provide some level of supervision over the other security officers, as per the directions of the Operations Manager, the plaintiff (who supervised the leads); one of the leads was Malika Savage, who is female.

4

16. Other leads included Thomas Ashe and Shaleka Butler.

17. The plaintiff was also informed by the Mr. Womack, that he could choose who he wanted as his Site Manager/Supervisor – at the time of his hire, that position was held by Malika Savage, who had been hired by the plaintiff's predecessor in his position, Talisha Perry, who is female (It is uncertain whether Ms. Perry continued to be employed by the defendant after the plaintiff was hired, however, based on the fact that she continued performing work for the defendant, it appeared she was still employed by it); the Site Manager/Supervisor worked under the supervisions of the Operations Manager, the plaintiff.

18. According the an employee of Thomas Jefferson University Hospital, for whom the defendant provided security services, named Lieutenant Houston, Ms. Perry should not have had any authority over the plaintiff after he was hired as the Operations Manager, but Mr. Womack allowed her to act as if she was the plaintiff's de facto supervisor; she was scheduled to start working for Thomas Jefferson University Hospital soon after the plaintiff was hired or before.

19. The defendant/Mr. Womack still kept Ms. Perry in the management loop, as if she still worked for the defendant, after the plaintiff was hired, and Mr. Womack gave her authority to direct and train the plaintiff, which was generally known by the defendant's employees at Jefferson, including the plaintiff's subordinates; this was unnecessary because plaintiff needed little if any guidance to perform his job based on his expertise and experience.

20. On November 23, 2023, after roll call, Ms. Perry told the plaintiff that he could go back to his office because "she" had nothing for him to do.

21. As of November 23, 2023, the defendant had not given the plaintiff keys to his own office; the defendant's employees, some of the plaintiff's subordinates worked out of that office with the plaintiff, knew that the plaintiff still had not been given keys to his own office, which reasonably embarrassed the plaintiff.

22. The plaintiff went to his office as Ms. Perry requested, only to find that the office was locked and that as of around 9:19 a.m., after the start of work, the employees, his subordinates, who also worked in the office, had not shown up for work to open the office.

6

23. That day, Ms. Perry summoned the plaintiff to come to where she was, indicating she had more training for him, contradicting her prior statement that she had nothing else for him to do.

24. The plaintiff's approximately 40 subordinates were aware that Ms. Perry was directing the plaintiff during the period of time referred to above, and that he was not being allowed to do his job independently, including even having keys to his office, for some unstated reason, which caused the plaintiff emotional distress.

25. The plaintiff soon learned by observation that Mr. Womack gave preferential treatment to his female employees over his male employees, including with respect to taking off from work.

26. The plaintiff tried to correct this differential treatment by treating male employees in the same manner as Mr. Womack treated female employees.

27. Mr. Womack allowed the plaintiff's subordinate, Ms. Savage to come and go as she pleased without informing the plaintiff of what he was doing, shirking the plaintiff's authority over his own subordinate.

28. As a part of his duties, the plaintiff was responsible for reviewing the defendant's employees' personnel files, including background criminal checks, for his subordinates; this information was contained in the defendant's computer/ system/application, called "HOMEBASE" (the system); these background checks were legally required by the Private Detectives Act, which prohibits licensed holders for security businesses in the Commonwealth to hire individuals with certain criminal convictions.

29. The Private Detectives Act prohibits licensed security/investigative companies, such as the defendant to hire individuals who have been convicted of such crimes as; (1) illegally using, carrying or possessing a pistol or other dangerous weapon;(2) making or possessing burglar's instruments; (3) buying or receiving stolen property; (4) unlawful entry into a building; (5) aiding escape from prison; (6) unlawfully possessing or distributing habit forming narcotic drugs; (7) picking pockets or attempting to do so; (8) soliciting any person to commit sodomy or other lewdness; (9) recklessly endangering another person; (11) terroristic threats; and (12) committing simple assault.

8

30. Shortly after his hire, the plaintiff requested full access to the HOMEBASE - the system, to perform his job and his legal duties; this access was also necessary to make his subordinates' (security personnel) work schedules.

31. On November 30, 2023, the plaintiff again requested to Mr. Womack, that he be given full access to the system, so that he could perform his job, including ensuring the defendant was legally compliant with state law, the Private Detectives Act of 1953; Mr. Womack rebuffed the plaintiff's request, stating that he wanted Ms. Perry to hold on to the plaintiff's duties for a while longer, although she was no longer the Operations Manager.

32. Because Ms. Perry should not have been authorized to supervise and manage the plaintiff, after his hire.

33. Approximately two weeks into his hire, the plaintiff's subordinates perceived that for unstated reasons by the defendant, that the plaintiff was not being allowed to do his job, but rather that essentially, Ms. Perry was still doing it, and that the plaintiff was taking directives from her.

34. On December 1, 2023, the plaintiff finally published the schedule – however, Mr. Womack reviewed the schedule and informed him that he

wanted Ms. Perry to redo it, which occurred; Ms. Perry's schedule was substantially the same as the one the plaintiff had done.

35. Mr. Womack was not allowing the plaintiff to perform his job, which was beginning to frustrate and humiliate the plaintiff, who knew that his subordinates were aware that he was being restricted in performing his job as the Operations Manager.

36. On December 10, 2023, the plaintiff received a text message from his subordinate, Ms. Savage, that she would now be doing the scheduling, at the direction of Mr. Womack, usurping the plaintiff's authority – Mr. Womack had not informed the plaintiff of this decision prior to making it; the plaintiff's subordinates became aware that Ms. Savage was now doing the scheduling, and not the plaintiff, essentially, that the Mr. Womack was not allowing the plaintiff to perform his essential duties as the Operations Manager; this fact was spreading amongst the defendant's entire workforce at Jefferson

37. On December 10, 2023, an employee, one of the plaintiff's subordinates, was given permission by Ms. Perry, to leave work for the day, without the plaintiff's being informed of Perry's decision; Mr. Womack was still

10

allowing Ms. Perry to unilaterally supervise the plaintiff's subordinates, without even consulting the plaintiff about what she was doing; the plaintiff's employees were aware that Ms. Perry was still being allowed to perform the plaintiff's job for unstated reasons almost a month after the plaintiff was hired.

38. As of December 11, 2023, the plaintiff had viewed a criminal history check for his subordinates in accordance with the law, the Private Detective Act of 1953 ("the Act").

39. On December 11, 2023, the plaintiff sent an email to Mr. Womack, informing him that he had discovered that 18 security officers on staff, had criminal convictions, including felonies explicitly prohibited by the Act and other crimes of moral turpitude, which were also prohibited by the Act; the email included information about the Act's potential criminal penalties for keeping criminally disqualified individuals on staff, and it indicated the plaintiff's awareness that the matter was very sensitive for the defendant.

40. Mr. Womack responded to the email above with his email dated December 12, 2023, in which Womack claimed that the people whom the

11

plaintiff had identified must have been new hires and that he would look into the matter; this was nonsensical, as the legally required criminal background checks should have been done before hire, and that the plaintiff was able to easily find the criminal convictions once he was finally given access to HOMEBASE.

41. In the emails referenced above, Mr. Womack and the plaintiff discussed one of the defendant's female security officers in Pittsburgh, who was alleged to have become pregnant by a 16 year old boy, at the school she was assigned to.

42. On December 13, 2023, Ms. Savage took off from work without her supervisor's (the plaintiff's) approval, usurping his authority – upon reasonable information and belief, Mr. Womack gave Ms. Savage the ability to usurp the plaintiff's authority on this occasion and generally, sending the message to her that he was allowing this for some unstated reason(s).

43. On December 15, 2023, the plaintiff sent an email that had attached to it, a list of defendant employees who had criminal convictions that disqualified them from working for the defendant (in the industry) under

12

the Act; there was a total of 18 officers; within the email, the plaintiff stated that he would start the process of terminating those employees' after the defendant's next training class for newly hired employees, who would replace them.

44. The list of criminally convicted disqualified employees referred to in paragraph 43 above included Talisha Perry and one of the leads named Thomas Ashe.

45. On December 16, 2023, Mr. Womack directed the plaintiff to go to Jefferson for an incident involving one of the defendant's security officers; the plaintiff went there, and he discovered that the employee had allegedly stolen $100.00 from someone's pocket book; investigation determined      that the employee had stolen the money.

46. The security officer referred to above, Ms. Davis, who is female, was one of the people the plaintiff had informed Mr. Womack of, who had a criminal conviction (for theft), she was on the list of disqualified employees referred to above.

47. On December 17, 2023, the plaintiff sent Mr. Womack a follow up email about the security officer who had stolen, noting she was an example of

13

the importance of complying with Act – later that day, Mr. Womack removed the plaintiff's access to HOMEBASE, without informing the plaintiff he was doing so, or why, disabling the plaintiff from performing the essential functions of his job as the Operations Manager.

48. As of December 20, 2023, the plaintiff learned that one of his subordinates had allegedly repeatedly abandoned his post; the plaintiff commenced an investigation into the matter, and he instructed potential witnesses to make witness statements; the employee in question was a friend of Ms. Perry; Ms. Perry, with M. Womack's blessing, instructed Ms. Savage, the plaintiff's subordinate not to obey the plaintiff's order to provide a witness statement about the incident; upon reasonable information and belief, either or both Ms. Perry and/or Mr. Womack were friends with the employee who had abandoned his post.

49. Ms. Savage was aware that for unstated reasons, that the defendant was allowing her to disobey the plaintiff, her supervisor.

50. On December 20, 2023, the plaintiff sent an email to Mr. Womack complaining that he believed that Mr. Womack was discriminating against him based on his sex, male, in favor of Ms. Perry, Ms. Savage and others.

14

Within the complaint, the plaintiff referenced not having access to HOMEBASE, Ms. Perry hindering his investigation, and Ms. Savage also being allowed to hinder his investigation and shirk his authority as her supervisor.

51. On December 20, 2023, the plaintiff suffered a workplace injury while walking up steps, injuring his back in the form of torn ligament (this injury was later determined to be three herniated disc in the plaintiff's back; the plaintiff's pain was so bad that he had to go to the hospital (Chestnut Hill) that day for emergency treatment; the plaintiff was informed by a doctor there, that he had torn a ligament in his back.

52. The Chestnut Hill Hospital Doctor gave the plaintiff a doctor's note with restrictions on standing and sitting for prolonged periods of times.

53. The plaintiff informed Mr. Womack of his injury sustained on December 20, 2024, the next day on December 21, 2023, including giving Womack medical records from the Chestnut Hill Hospital emergency room and the doctor's note referred to in paragraph above, which advised the plaintiff to restrict prolonged standing and sitting.

15

54. The plaintiff met the reporting provisions of Workers' Compensation Act (WCA) by informing his supervisor, Mr. Womack of his work related injury within 21 days of the injury including informing Womack orally and in writing, including with medical proof of his injuries.

55. Mr. Womack did not instruct the plaintiff to do anything else regarding reporting his workplace injury to anyone else working for the defendant, including its Human Resources Department.

56. Mr. Womack did not report the plaintiff's workplace injury to his/the defendant's workers' compensation insurance carrier pursuant to the requirements of the WCA; nor did he fulfill his requirement to investigate the incident/injury to determine if compensation was due; nor did he pay or agree to pay the plaintiff compensation for his injury.

57. Rather, Mr. Womack concealed the workplace injury, violating the plaintiff's rights under the WCA.

58. Rather than complying with the WCA, Mr. Womack instructed the plaintiff to go out of work on unpaid leave, which the plaintiff refused to do because he needed income; the plaintiff continued working, simply tolerating severe back pain.

16

59. Nobody from the defendant's human resources office contacted the plaintiff to further process the plaintiff's workers' compensation claim or to inform him of his rights under the WCA.

60. Upon reasonable information and belief, Mr. Womack concealed and covered up the plaintiff's workplace injury to avoid having to comply with the WCA, and also to retaliate against the plaintiff for trying get him to comply with the Private Detectives Act by terminating legally disqualified employees with prohibitive convictions, which the plaintiff had informed of in writing last on December 15, 2023, 5 days before his workplace injury.

61. On/around December 21, 2023, and/or thereafter, Mr. Womack told the defendant's Vice President (V.P.), Mr. Rodriguez that the plaintiff was supposed to go out from work on unpaid leave as result of his workplace injury, which was legally incorrect.

62. Mr. Womack directed Mr. Rodriguez to fire the plaintiff because he would not do out on an indefinite unpaid leave of absence.

63. On January 3, 2024, Mr. Rodriguez met the plaintiff at Jefferson, where he told the plaintiff, that as per Mr. Womack 's order, that the plaintiff's employment was terminated because he came to work rather than taking an unpaid leave of absence, as well as for violating some unspecified modified policy (which Mr. Rodriguez did not identify to the plaintiff).

64. Prior to being fired, the defendant/Mr. Womack had never informed the plaintiff that he had violated a modified policy – the plaintiff did not violate a modified policy.

65. The plaintiff accepted his termination without any protests, and as per Mr. Rodriguez's order, he peacefully left the building immediately and did not return, which Mr. Rodriguez knew.

66. On January 3, 2023, Mr. Rodriguez informed Ms. Perry and the plaintiff's former subordinates, that he was no longer employed by the defendant as of that day, including Ms. Savage, Ms. Butler, and Mr. Ashe, including by sending a text message that stated in part, as follows: "thank you Miss Talisha Perry for copying pasting my last message as of 4:54 PM today, Mr. Christopher Milton has been released from his duties and is no longer employed with Homeland intelligence. Please advise all employees that he

is no longer with our company and should not be contacted for any business related concern, issues or comments.  If he is to breach any medical detector or unauthorized area, he should be treated as a trespasser if not in an appropriate areas for medical attention."

67. Upon reasonable information and belief, based on the instruction in the text message referred to in paragraph above, Ms. Perry repeatedly published the words that Mr. Rodriguez published to her to all of the defendant's employees.

68. The suggestion that the plaintiff was inclined to breach metal detectors and attempt to gain unauthorized entrance into a facility, equated to stating that he would commit a crime such as burglary and/or trespassing, and that he was potentially some form of security threat to all of the defendant's employees, which was published in writing; there was no basis in fact for such an assertion, which Mr. Rodriguez knew, because the plaintiff had accepted his termination peacefully, without incident, and left the building immediately without incident, which Rodriguez knew.

69. The text publication referred above also suggested by the word "breach" that the plaintiff was potentially dangerous, for which there was no basis in fact, which Mr. Rodriguez and Mr. Womack knew.

70. After he was fired, the plaintiff learned from defendant employees, Ms. Butler, and employee named Mr. Nelson, an employee named Mr. Ashe, and an employee named Mr. Jackson, all of whom were previously the plaintiff's subordinates, that the defendant's "leads", including Ms. Savage, had orally told them and other security officers repeatedly (the plaintiff's former subordinates), that the plaintiff was fired because he did not do any work, which is knowingly false; the aforementioned named employees, including Ms. Savage herself, and the unnamed employees had no reason to know the reason for the plaintiff's termination, either true or false (which was knowingly false).

71. Ms. Savage had been the plaintiff's subordinate and was not in his upward chain of command and should not have been involved in any decision to fire him, including the reasons therefore – the only persons in that chain of command were Mr. Womack and Mr. Rodriguez, who were the only possible sources as to any reason that the plaintiff was fired; Ms. Savage

and other leads published had no reason to know why the plaintiff was fired, however they published the false reason to the entire workforce at Jefferson, the plaintiff's former subordinates; the other leads were Mr. Ashe and Ms. Butler (who according to Mr. Nelson were stating that the plaintiff was fired for not doing any work, which is knowingly false).

72. Upon reasonable information and belief, on January 3, 2024, and within days thereafter, numerous employees were trying to find out why the plaintiff had been fired, to which the above named leads, upon false information from Mr. Womack and Mr. Rodriguez, stated that the plaintiff was fired for not doing his job/not doing any work, suggesting that either he was lazy, and/or unprofessional and/or incompetent.

73. As an indication of malice, the defendant challenged the plaintiff's claim for unemployment compensation, by falsely informing the Unemployment Compensation investigator, that the plaintiff was fired for violating a defendant policy.

74. The defendant's conduct, while the plaintiff was still employed by it, in not allowing him to perform his duties, which Ms. Perry and Ms. Savage were assigned to do, conveyed the knowingly false message by publication that

21

the plaintiff was not competent or fit to perform his duties – this was false and it was published to the plaintiff's subordinates from December 31, 2024 until the plaintiff was fired.

75. Within the plaintiff's workplace, it became generally known by his approximate 40 supervisees, that he was not allowed to make the schedule, that he was restricted in hiring and firing, that he was restricted in investigating misconduct and that he was restricted in issuing discipline.

76. The defendant's conduct summarized above in paragraphs above defamed the plaintiff and placed his professional reputation in a false light; the events described in paragraph 75 above occurred within one year of the filing of this Complaint.

77. As a result of the defendant's acts against the plaintiff, summarized above, the plaintiff suffered severe economic harm, severe emotional distress, physical pain, reputational damage, humiliation and loss of enjoyment of life.

78. The defendant's conduct against the plaintiff was done maliciously to harm him, because the defendant did not want to comply with the Private Detectives Act and the Worker's Compensation Act.

79. The defendant intentionally refused to pay the plaintiff four hours of overtime that it knew the plaintiff was due.

### COUNT ONE – SEX DISCRIMINATION IN VIOLATION OF TITLE VII

80. The plaintiff incorporates paragraphs 1-79 above as though fully set forth herein.

81. The defendant discriminated against the plaintiff based on his sex with terms and conditions of his employment, including but not limited to not allowing him to perform his duties, sabotaging his authority, undermining him, in favor of its female similarly situated employees, including Ms. Perry and Ms. Savage.

82. The defendant fired the plaintiff based on his sex for falsely concocted disciplinary reasons, while it allowed Ms. Perry in particular to evade termination, after she was disqualified from performing in the industry, based on the Private Detectives Act.

83. The defendant allowed Ms. Savage to thwart any form of discipline, after she was insubordinate to the plaintiff, an offense which reasonably justified termination.

84. The defendant's actions in sabotaging the plaintiff based on his sex, male, were done intentionally, and for the purpose of terminating his employment to his great detriment, which caused the plaintiff severe financial harm, as well as severe emotional distress.

WHEREFORE, the plaintiff requests judgment in his favor against the defendant, and he requests the following relief:

   a. Back pay;

   b. Front pay;

   c. Compensatory damages;

   d. Punitive damages;

   e. Reasonable attorney's fees and costs;

   f. Any other relief the Court deems appropriate.

COUNT TWO – DISCRIMINATION BASED ON A HOSTILE WORK ENVIRONMENT BASED ON SEX IN VIOLATION OF TITLE VII

85. The plaintiff incorporates paragraphs 1-84 above as though fully set forth herein.

86. The defendant, through its management, including Mr. Womack, Ms. Perry, and Ms. Savage systematically subjected the plaintiff to a hostile work

24

environment based on his race, including by sabotaging his authority, not allowing him to perform his duties, slandering him, micromanaging him, not allowing him to manage and discipline his subordinates, questioning his competence, and encouraging his subordinates not to follow his directives – this was done in favor of allowing Ms. Perry and Ms. Savage to essentially do his job, which the defendant's workforce knew was occurring.

87. The defendant's actions summarized above were objectively and subjectively offensive, and they caused the plaintiff severe emotional distress.

88. The defendant's management carried out the actions summarized above, with the intent to drive the plaintiff out of his employment, which essentially occurred.

89. When the plaintiff sought corrective action from Mr. Womack, he was rebuffed and retaliated against, including terminated from his employment.

90. The defendant's actions were pervasive, as they were ongoing virtually every day from the start of the plaintiff's employment until it was abruptly ended on January 3, 2024.

25

WHEREFORE, the plaintiff requests judgment in his favor against the defendant, and he requests the following relief.

   a.  Compensatory damages;

   b.  Punitive damages;

   c.  Reasonable attorney's fees and costs;

   d.  Any other relief the Court deems appropriate.

<u>COUNT THREE – RETALIATION IN VIOLATION OF TITLE VII</u>

91. The plaintiff incorporates paragraphs 1-90 above as though fully set forth herein.

92. The plaintiff complained of sex discrimination to the defendant's owner via email on December 3, 2024, based on the conduct summarized above.

93. The defendant refused to take any corrective action based on the plaintiff's complaint, rather it abruptly terminated his employment on January 3, 2024, based on intentionally concocted false reasons, in retaliation for complaining of sex discrimination, including in favor of Ms. Perry and Ms. Savage.

94. The plaintiff suffered severe economic harm from the defendant's retaliation by being fired, and he also suffered severe emotional distress for the same reason.

WHEREFORE, the plaintiff requests judgment in his favor against the defendant, and he requests the following relief:

 a. Back pay;

 b. Front pay;

 c. Compensatory damages;

 d. Punitive damages;

 e. Reasonable attorney's fees and costs;

 f. Any other relief the Court deems appropriate.

<u>COUNT FOUR – VIOLATION OF THE ADA AND THE ADAA</u>

95. The plaintiff incorporates paragraphs 1-94 above as though fully set forth herein.

96. After the plaintiff suffered a workplace injury on December 20, 2023, injuring his back, the defendant perceived that he was disabled, and treated him as though he was disabled.

97. Even though the plaintiff was able to perform the essential functions of his employment with or without reasonable accommodation, the defendant refused to allow him to continue working, and fired him based on its false contention that he was disabled and unable to perform his duties as Operations Manager.

98. The defendant refused to even attempt to reasonably accommodate the plaintiff so that he could continue employed.

WHEREFORE, the plaintiff requests judgment in his favor against the defendant, and he requests the following relief:

   a. Back pay;

   b. Front pay;

   c. Compensatory damages;

   d. Punitive damages;

   e. Reasonable attorney's fees and costs;

   f. Any other relief the Court deems appropriate.


## COUNT FIVE –TERMINATION OF EMPLOYMENT IN VIOLATION OF PUBLIC POLICY –VIOLATIONS OF PRIVATE DETECTIVES ACT

99. The plaintiff incorporates paragraphs 1-98 above as herein as though fully set forth herein.

100.    The defendant terminated the plaintiff's employment because he reported numerous violations of the Private Detectives Act to it, which the defendant did not want to take corrective actions for, including firing and replacing approximately 18 security officers, who were legally disqualified for their positions under the Act.

101.    Rather than firing the disqualified employees, whom the plaintiff as Operations Manager was responsible for (they were his direct subordinates), the defendant chose to fire the plaintiff on a known concocted and false basis.

102.    The Private Detectives Act prohibits persons convicted of various and many crimes, from working as security officers for detective businesses (which the defendant is); it also requires that such businesses do pre-hire criminal background checks to avoid hiring disqualified employees (The Act at Section 13).

103.    The Act criminalizes the knowing hire of disqualified persons, classifying it as a misdemeanor, with penalties ranging from fines to imprisonment (The Act at Section 13).

104.    After the plaintiff reported violations of the Act to the defendant, along with his plans to terminate the employment of the disqualified employees, the defendant refused to take corrective action and it locked the plaintiff out of HOMEBASE, so that he could not properly perform his duties, including firing anyone.

105.    Shortly thereafter, the defendant fired the plaintiff on a false and pretextual basis.

106.    The defendant's termination of the plaintiff violated the public policy of the Commonwealth of Pennsylvania, because it was done because the plaintiff was attempting to comply with state law, the Private Detectives Act, which the defendant had not complied with and did not want to comply with in the future.

107.    The defendant's termination of the plaintiff's employment was done maliciously and wantonly, because he was trying to comply with the law – the defendant intentionally concocted a false basis to fire the plaintiff.

108.     As a result of the defendant's conduct, the plaintiff suffered severe economic harm and he suffered extreme emotional distress.

WHEREFORE, the plaintiff requests judgment in his favor against the defendant and he requests the following relief:

a.  Back pay;

b.  Front pay;

c.  Compensatory damages;

d.  Punitive damages.

## COUNT SIX – TERMINATION OF EMPLOYMENT IN VIOLATION OF PUBLIC POLICY BASED ON VIOLATIONS OF THE WORKERS' COMPENSATION ACT

109.     The plaintiff incorporates paragraphs 1-108 above herein as though fully set forth herein.

110.     On December 20, 2023, the plaintiff suffered a serious workplace injury, injuring his back, for which he had to obtain medical treatment at the emergency room at Chestnut Hill Hospital; the plaintiff reported his injury to the defendant and Mr. Womack, including with medical records and a doctor's note, which included the plaintiff's restrictions.

111.     The defendant refused to report the plaintiff's injury and refused to process a worker's compensation claim for the plaintiff after he reported

31

his injury, in violation of the Commonwealth of Pennsylvania Workers' Compensation Act (the Act); rather than comply with the law, the defendant insisted that the plaintiff go out of work on an unpaid leave of absence, skirting the plaintiff's right to benefits under the Act.

112.    The defendant informed the plaintiff that he was fired because he would not take an unpaid leave of absence – essentially because he reported his workplace injury and the defendant intentionally refused to comply with the Act, which compliance would have preserved the plaintiff's employment.

113.    It is the public policy of the Commonwealth of Pennsylvania that an employer may not terminate an employee's employment for reporting a workplace injury (making a worker compensation claim).

114.    Here, the plaintiff made a worker compensation claim, by properly reporting his work place injury to the defendant.

115.    The defendant's conduct was willfully malicious and wanton because it was based on willful violations of the Act.

116.    As a result of the defendant's conduct, the plaintiff suffered severe economic harm, and he suffered severe emotional distress.

32

WHEREFORE, the plaintiff requests judgment against the defendant in his favor and he requests the following relief:

a. Back pay;

b. Front pay;

c. Compensatory damages;

d. Punitive damages.

## COUNT SEVEN -DEFAMATION

117.   The plaintiff incorporates paragraphs 1-116 above herein as though fully set forth herein.

118.   The defendant defamed the plaintiff by making intentionally false statements to its general workforce, including the plaintiff's former subordinates, about why the defendant fired the plaintiff, including that he was fired because he did not do any work (implying that he was lazy and/or that he had a poor work ethic and/or that he was incompetent).

119.   The plaintiff worked as hard as he could for the defendant, including trying to bring it as close as possible, into compliance with state law; the plaintiff has and had a great work ethic and he was well qualified to be the

defendant's Operations Manager, based on his experience as a licensed detective and his prior employment.

120.    The defendant's employees understood its publication about why the plaintiff was fired to pertain to the plaintiff, and they understood the statements to mean that the plaintiff did not do his job properly.

121.    The defendant was not privileged to publish the false statements it did to its general workforce, including the plaintiff's former subordinates.

122.    The plaintiff suffered reputational damage from the defendant's publications, including to his personal and professional reputations, including in his professions, detective services and security services.

123.    The defendant defamed the plaintiff by publishing false assertions to the defendant's general workforce, that he was fired for a policy violation(s)-that he committed some form of misconduct, which is false.

124.    The employees to whom the defendant published the false statements in paragraph above, understood the statements to apply to the plaintiff and they understood them to mean that the plaintiff was fired for a policy violation (s).

125.    The defendant's false statements to its general work force were not privileged.

126.    The plaintiff suffered reputational damage to his personal and professional reputation, by falsely asserted misconduct, including damage to his reputation for being fit for his professions, detective services and security services; the plaintiff suffered severe emotional distress from the defendant's knowingly made false statements.

127.    To the extent that the plaintiff was fired on the basis any of any of the false statements above, he suffered severe economic harm.

128.    The defendant's conduct harmed/damaged the plaintiff's personal and professional reputations, by impugning his competence, his trustworthiness, and his work and his professional judgment, calling into question his qualifications and fitness for his professions as a private detective and as someone working in the security industry.

129.    The defendant's conduct was intentional, malicious and wanton for the purpose of destroying the plaintiff's reputations.

WHEREFORE, the plaintiff requests judgment in his favor against the defendant and he request the following relief:

35

a. Compensatory damages;

b. Punitive damages.

## COUNT FOUR —INVASION OF PRIVACY BY FALSE LIGHT

130. The plaintiff incorporates paragraphs 1-129 above herein as though fully set forth herein.

131. The defendant falsely published to its general work force that the plaintiff was fired because he did not do any work- that he did not do his job.

132. The defendant's statements, directly above, were knowingly false, and were made to the plaintiff's subordinates, approximately forty employees.

133. The plaintiff was reasonably, highly offended by the defendant's false publications about him, and he suffered humiliation, embarrassment and severe emotional distress as a result of it.

134. The defendant's knowingly false statements referred to above, identified the plaintiff, and the statements were intentionally made to harm the plaintiff, including in retaliation for reporting illegal conduct to

the defendant, and for trying to take corrective actions to rectify that conduct.

WHEREFORE, the plaintiff requests judgment in his favor against the defendant and he requests the following relief:

a. Compensatory damages;

b. Punitive damages.

BY:

/S/ Reginald C. Allen, Esquire